Jesse COMER and Jewel Culverhouse, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Jack KEMP, in his official capacity as Secretary of the United States Department of Housing and Urban Development; and United States Department of Housing and Urban Development; and Belmont Shelter Corporation; and Town of Amherst, New York, Defendants.

Jesse COMER, Hazel Grimes, Yvonne Primm, and Felicia Stokes, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Jack KEMP, in his official capacity as Secretary of the United States Department of Housing and Urban Development; and United States Department of Housing and Urban Development; and Rental Assistance Corporation of Buffalo; and City of Buffalo, New York, Defendants.

Jesse COMER, Rosemary Comer, Jewel Culverhouse, Hazel Grimes, Annette McCutcheon, individually and on behalf of all persons similarly situated, Plaintiffs,

v.

Jack KEMP, in his official capacity as Secretary of the United States Department of Housing and Urban Development; and United States Department of Housing and Urban Development; and Buffalo Municipal Housing Authority,

and Lawrence A. Grisanti, individually and in his official capacity as former Executive Director of the Buffalo Municipal Housing Authority; and City of Buffalo, New York; and James D. Griffin, in his official capacity as Mayor of the City of Buffalo, New York; and Richard L. Higgins, individually and in his official capacity as Commissioner of the New York State Division of Housing and Community Renewal,. Defendants.

No. 89–CV–1556C.

United States District Court,
W.D. New York.

June 2, 1993.

Neighborhood Legal Services, Inc. (Dennis M. McGrath and Barbra A. Kavanaugh, of counsel), Buffalo, NY, Greater Upstate Law Project (Michael L. Hanley and Ellen M. Yacknin, of counsel), Rochester, NY, and NAACP Legal Defense Fund, Inc. (Alice L. Brown, of counsel), New York City, for plaintiffs.

U.S. Dept. of Justice, Civ. Div. (Stuart A. Licht and Lisa A. Olson, of counsel), and U.S. Dept. of Housing and Urban Development (James C. Brylinski, Buffalo, NY, and Patricia Sharin Flagg and Michael T. Robinson, of counsel), Washington, DC, for defendants Kemp and U.S. Dept. of Housing and Urban Development.

Damon & Morey (James N. Schmit, of counsel), and Sally S. Mennen, Buffalo, NY, for defendant Buffalo Mun. Housing Authority.

Carl Tronolone, Buffalo, NY, for defendant Lawrence A. Grisanti.

Laurence K. Rubin, Corp. Counsel for City of Buffalo (R. Peter Morrow, III, of counsel), Buffalo, NY, for defendants City of Buffalo and Mayor James D. Griffin.

Robert Abrams, NY State Atty. Gen. (Mark Walling, Asst. NY State Atty. Gen., of counsel), Buffalo, NY, for defendant Richard L. Higgins.

Lippes, Silverstein, Mathias & Wexler (Sharon M. Porcellio, of counsel), Buffalo, NY, for defendant Rental Assistance Corp. of Buffalo.

Saperston & Day, P.C. (Charles C. Swanekamp, of counsel), Buffalo, NY, for defendant Belmont Shelter Corp.

John T. Lane, Williamsville, NY, for defendant Town of Amherst.

## DECISION AND ORDER

JOHN T. CURTIN, District Judge.

This civil action, alleging racial discrimination in public housing and assistance programs, is filed as a class action. Plaintiffs seek to remedy defendants' policies, practices, and procedures which, for decades, allegedly have created and perpetuated deliberate racial discrimination within the state and federal low-income housing programs which defendants administer in the City of Buffalo and Erie County, New York. The class which plaintiffs seek to represent includes all former, current, and future minority residents of and applicants to Buffalo public housing projects and area Section 8 certificate programs.

## PROCEDURAL HISTORY

Plaintiffs, individually and in seeking to represent a class of others similarly situated, originally filed this suit on a single complaint. Defendants moved to strike portions of the complaint, but this court denied their motions. Item 38. Defendants next moved to stay the issuance of an order certifying the class pending discovery on the class certification issue. *See generally* Items 39–48.

At a hearing held to discuss the various motions, the court ordered plaintiffs' counsel to file proposed amended complaints reflecting the court's recommendation that there were at least three distinct general issues involved in the lawsuit. The court further noted the prospect of three separate classes. This was done for the purpose of clarity and to provide a guide for the conduct of depositions to follow on the class certification issues. Item 67.

Accordingly, plaintiffs filed three separate first amended complaints. One was filed by Jesse Comer, Jewel Culverhouse, and on behalf of all those similarly situated, against the Belmont Shelter Corporation [Belmont], the Town of Amherst [Amherst], and the United States Department of Housing and Urban Development and its Secretary, Jack Kemp [HUD or federal defendants]. Item 68, First Amended Complaint [Belmont]. A second complaint was filed by Jessie Comer, Hazel Grimes, Yvonne Primm, and Felicia Stokes against the Rental Assistance Corporation [RAC], the City of Buffalo [Buffalo], and the federal defendants. Item 69, First Amended Complaint [RAC]. The third was filed against all of the remaining defendants from the original complaint, including: the federal defendants, the Buffalo Municipal Housing Administration [BMHA] and its former executive director, Lawrence Grisanti; the City

of Buffalo, and its Mayor, James D. Griffin; and Richard Higgins, the Commissioner of the New York State Division of Housing and Community Renewal [DHCR]. Item 70, First Amended Complaint [BMHA].

All of the defendants have answered plaintiffs' various first amended complaints. *See* Item 72 (Grisanti); Item 76 (Belmont); Item 77 (Higgins); Item 79 (BMHA); Item 80 (Amherst); answers of the federal defendants, Item 87 (Belmont Compl.), Item 88 (RAC Compl.), Item 89 (BMHA Compl.); Item 90 (RAC), Item 97 (Buffalo & Griffin). Plaintiffs and defendants Belmont and RAC have also filed their statements of fact pursuant to local rule 13(d)(1). *See* Items 124, 126, 137, 138.

A review of the current posture of this case discloses that all defendants, except for the City of Buffalo, either have moved to oppose class certification, or have moved for dismissal and/or summary judgment on the grounds of plaintiffs' lack of standing. *See* Items 82, 83 (Higgins); Items 113, 114 (HUD); Item 116 (Amherst); Items 119, 123 (Belmont); Item 115 (BMHA). Extensive discovery materials, affidavits, and deposition testimony have been filed with the court. *See* Items 85, 158 (Higgins); Items 117, 153 (RAC); Item 119, 156 (Belmont); Items 135, 179 (Plaintiffs' Exhibits). Plaintiffs have responded to defendants' challenges, and defendants have again replied.[1] *See* Items 91, 104, 132, 133, 134, 246 (Plaintiffs); Items 93, 159 (Higgins); Item 154 (RAC); Item 157 (Belmont); Items 115, 161, 259–60 (BMHA). The court has heard oral argument on the standing issues, now pending decision. Item 188.

Several rounds of intervenor motions have been filed on behalf of plaintiffs. However, in ruling on the application of a second round of intervenors, this court decided to first dispose of the various motions concerning plaintiffs' standing and class certification issues before considering any further intervenor applications. *See* Item 255. Plaintiffs have challenged this approach, but the Second Circuit affirmed this court's order.

*Comer v. Kemp,* 990 F.2d 623 (2d Cir.1993) (unpublished opinion).

## BACKGROUND

The Housing and Community Development Act of 1974 (HCDA), P.L. 93–383, created two programs which are relevant to plaintiffs' claims. Title I of the HCDA, § 101, *et seq.,* created the Community Development Block Grant (CDBG) program. Title II of the HCDA, § 201 *et seq.,* amended the United States Housing Act of 1937 to add a new "Section 8," which created a program popularly known as the Section 8 Existing Housing program (Section 8).

Under the Section 8 program, defendant United States Department of Housing and Urban Development (HUD) authorizes local agencies, referred to as public housing administrators/agencies (PHAs), to issue a "certificate" or "voucher" to eligible lower-income families, which entitle them to have the PHA pay a portion of their rent directly to the landlord. These rent subsidies are subsequently reimbursed by defendant HUD. Unlike public housing projects or other HUD-sponsored multi-family subsidized housing programs, Section 8 subsidies are not generally linked to the rental unit. Once a certificate or voucher is issued, if the recipient family moves from its chosen apartment, it may carry its certificate or voucher to the next apartment. However, a family with a Section 8 certificate or voucher must find itself a private landlord who participates in the program.

Defendant HUD has adopted the use of metropolitan statistical areas (MSAs) to establish the boundaries of a particular PHA market area. The MSA is determined by an evaluation of the geographic area in which housing units are in mutual competition. 53 Fed.Reg. 36701. Under this system, defendant HUD has identified all of Erie County, including the City of Buffalo, as a single housing market. Item 69 ¶¶ 32–35 at 8.

The PHA is often a municipal entity which arranges for a separate agency to administer

---

1. The court has not had occasion to consider, for the purposes of this motion, the federal defendants' most recent submission of a supplemental memorandum and affidavits in opposition to plaintiffs' motion for class certification filed on May 28, 1993. Item 262.

the local Section 8 program. Typically, the PHA is a not-for-profit corporation, specializing in the administration of lower-income housing programs. The PHA enters into an Annual Contributions Contract with defendant HUD, which provides for the payment of administrative fees to the PHA by defendant HUD. In connection with the Annual Contributions Contract, the PHA must submit both an Administrative Plan and an Equal Housing Opportunity Plan which describe the administrative details of the Section 8 program and compliance with federal and state equal housing requirements. 24 C.F.R. § 882.111.

The Equal Opportunity Housing Plan must describe the manner in which the PHA will achieve the participation of qualified landlords both "outside areas of low income or minority concentration," and outside the local jurisdiction in any area where the PHA is not legally barred from entering into contracts." 24 C.F.R. § 887.59(c). As part of its Administrative Plan, the PHA must include a description of the geographic area its program will serve. 24 C.F.R. § 882.203–4.

Defendant HUD has authorized the City of Buffalo (City), as a PHA, to operate the City's Section 8 program. The City, in turn, entered into a contract with defendant Rental Assistance Corporation (RAC) to administer the City's program. Defendant HUD has also authorized defendant Town of Amherst (Town) as a PHA, to operate a Section 8 Existing Housing program on behalf of a 41–community consortium. The defendant Town is party to an agreement for the administration of its Section 8 program with defendant Belmont Shelter Corporation (Belmont).

## A. RAC

The Rental Assistance Corporation (RAC) is a not-for-profit corporation which is under contract with the City of Buffalo as an agent to administer the City's Section 8 Existing Housing Program on behalf of the City of Buffalo. Over ninety percent of the households reportedly serviced by RAC are minorities. RAC was incorporated on October 17, 1988, and only began operating on March 1, 1989. Item 118 at 1. Prior to RAC's March 1989 commencement of operations, the Section 8 program was administered for the City by the Housing Council of the Niagara Frontier (HCNF). In turn, the HCNF became the Housing Development Corporation of Western New York (HDC), which is still in operation today, purportedly operating as a separate entity from RAC.

Sometime during 1987–88, the City expressed an interest in pursuing greater input and accountability over the Section 8 program. A contract battle between the City and HDC ensued over the City's requested representation on the HDC board of directors. In part, RAC was born of the resolution of the dispute between HDC and the City. The City terminated its contract with HDC and entered into a new contract with RAC. In contrast to the former City contract with HDC, RAC's contract provided for the City to appoint four members to RAC's board of directors. While RAC and HDC have a number of common directors, the City appointees do not serve on the HDC board. The RAC contract also called for the City to retain a percentage of the administrative fees earned by RAC for operation of the Section 8 program. Although it lost its contract, HDC managed to retain all of its assets in order to pursue other charitable housing activities. In any event, HDC's records on the Section 8 program were turned over to RAC when RAC took over the program in 1989.

With respect to RAC's policy regarding the Section 8 program, RAC maintains a waiting list of households who have applied for, and are determined eligible for, housing assistance administered by RAC. The order of applicant selection is primarily determined by the existence of a "federal preference," as established by statute. Thus, first preference is given to applicants who are involuntarily displaced, living in substandard housing, or paying more than 50 percent of their income toward rent. 42 U.S.C. § 1437f(d)(1)(A); 24 C.F.R. § 882.219.

According to affiant George Fanelli, if an applicant indicates qualification for a federal preference, the name is listed as meeting the federal preference requirement and placed on an appropriate waiting list. In addition, as of August 1990, RAC combined its waiting

list with that of BMHA. Accordingly, if a person applies at BMHA, they are automatically placed on the waiting list of RAC, and vice versa. Item 117, Filim Aff. ¶ 5 at 2. Applicants are chosen by the date of their application and those applicants who claim a federal preference are offered assistance prior to any non-federal preference applicants. As of late October 1990, there reportedly were in excess of 7,000 applicants on the waiting list, 70 percent of whom claim a federal preference. According to RAC, it would take at least nine years for all of its applicants claiming federal preferences to obtain assistance. *Id.* Fanelli Aff. ¶¶ 16–17 at 4–5.

Once an applicant is chosen from the waiting list, RAC provides the eligible lower income applicant family with either a voucher or a certificate. *Id.* Fanelli Aff. ¶ 18 at 5. In their lawsuit, plaintiffs challenge only RAC's certificate program as illegally restricting the use of Section 8 certificates to the City of Buffalo. *See* Item 69 ¶¶ 54–69. Initially, RAC's Administrative Plan limited its jurisdiction to the City of Buffalo, ostensibly because RAC was under contract to the City to perform a City function. Subsequently, in January 1990, RAC proposed, subject to City approval, amending the language concerning certificates in its Administrative Plan to include all of Erie County. Meanwhile, on July 2, 1990, HUD issued a directive to all PHAs which required every PHA to advise certificate holders that they had a right to move anywhere within the PHA's metropolitan statistical area or within some contiguous area. *Id.* Fanelli Aff. ¶¶ 25–28 at 7–8 and Ex. A.

## B. BELMONT

Defendant HUD authorized defendant Town of Amherst (Amherst) as a public housing authority, to operate the Section 8 Existing Housing program on behalf of the Erie County consortium. Item 124 at ¶ 1. Presently, the consortium consists of 41 municipalities, surrounding defendant City of Buffalo. Three communities do not belong to the consortium: Kenmore, Wales, and the City of Buffalo. Erie County believed that a group of communities, joined together, would

establish economies of scale to maximize the amount of assistance that could be obtained from federal authorities. The Erie County Community Development consortium, therefore, was created to pool resources among its smaller communities that otherwise would not have applied to HUD for Section 8 assistance, or that would not have been able to effectively administer a Section 8 program, or did not fully understand the requirements of the program. Item 157 at 2–3. The City of Buffalo was never invited to join the consortium because it was an entitlement community receiving community development funds and already had an existing Section 8 program in place. *Id.* at 2 n. 1.

In 1977, Amherst entered into an agreement with a not-for-profit agency, defendant Belmont Shelter Corporation (Belmont), to administer the suburban Section 8 Existing Housing program on behalf of the consortium. In addition, Belmont promotes housing development, construction of affordable homes and apartments, and supervises the management of subsidized apartments. Item 119, Huckabone Aff. at ¶ 2.

The Belmont Section 8 program is, in many ways, similar to that of RAC. As a Section 8 administrator, defendant Belmont is directly responsible for the selection of program participants pursuant to federal and state laws. For example, Belmont must adhere to the same regulations concerning federal preferences and outreach as RAC. Belmont is also responsible for the daily administration of the Erie County consortium's Section 8 programs. The one critical distinction between the Belmont and RAC program is Belmont's use of a local preference in addition to the federally mandated preference structure. Defendants argue that it is understandable that a community participating in the consortium would want to establish a preference for individuals either working or living in a member community. Plaintiffs contend that the consortium's local preference has prevented minorities from moving to the suburbs.

## C. BMHA

The Buffalo Municipal Housing Authority (BMHA) was organized in 1934 as an inde-

pendent housing authority under the provisions of article 5 of the former state housing law. *See* § 403, Public Housing Law. Among the powers vested in the BMHA as a public housing authority is the power to enter into contractual and other agreements with the federal government in connection with federal projects and other federally funded programs to provide housing for lower-income individuals. Public Housing Law § 37(1)(i). A "federal project" is a project aided or financed in part or in whole by the federal government. *Id.* at § 3(15). On the other hand, a "state project" is aided or financed in part or in whole by the state, but not in any way by the federal government. *Id.* at § 3(16).

BMHA and the City of Buffalo (City) administer 29 public housing projects, 25 of which are federal projects and 4 of which are state projects. Item 70 at ¶¶ 35–37. Two of the state-aided projects, Frederick Douglas Towers and Ferry–Grider Homes, are currently in operation. However, two state-funded projects representing some 960 apartment units, Ellicott Mall and Kensington Heights, are no longer in operation. Plaintiffs contend that defendants City of Buffalo, BMHA, and Higgins have taken steps to transfer the Kensington and Ellicott projects to private ownership and allowed these two projects to become uninhabitable. *Id.* at ¶¶ 216–20 & 207.

The New York State Division of Housing and Community Renewal (DHCR) provides housing authorities with state funding for their Section 8 programs. The BMHA state-aided projects receive no federal funds. In fact, without approval from the DHCR Commissioner, no state housing monies allocated to an authority or a municipality can be commingled with federal aid. Public Housing Law § 75. BMHA has agreed in its loan/subsidy contract with DHCR that it will not obtain funds from any source other than the state in connection with either of its state projects without first obtaining the approval of the Commissioner of DHCR. Moreover, in each BMHA contract with DHCR, the authority has agreed to place the funds and income with respect to the relevant project in a separate fund earmarked for the operation of that project. Item 83 at 2.

Since 1975, the City has received in excess of $269 million from defendant HUD as a grantee under the Community Development Block Grant (CDBG) program. The City has used the funds to pay for all or part of its housing code enforcement program. As a condition to receipt of CDBG funds, pursuant to 42 U.S.C. § 5304(b)(2), a grantee must "affirmatively further fair housing." Item 70 at ¶¶ 178–79, 183. As an additional condition to receipt of the CDGB funds, a grantee must administer the grant in conformance with Title VI of the Civil Rights Act of 1964, and Title VIII of the Civil Rights Act of 1968, also known as the Fair Housing Act of 1968, as amended in 1988. *Id.* at ¶ 181. Finally, the Housing and Community Development Act requires that each CDGB funds recipient submit, pursuant to 42 U.S.C. § 5304(e), an annual performance report for defendant HUD's review. The report must specifically address a CDGB recipient's accomplishments with respect to Title VI and Title VIII compliance, and the recipient's efforts at meeting the statutory obligations to affirmatively promote fair housing under 42 U.S.C. § 5304(b)(2). *Id.* at ¶¶ 188–89.

## DISCUSSION

Each defendant in each complaint, with the exception of the City of Buffalo, has filed a motion seeking dismissal and/or summary judgment challenging various plaintiffs' individual and class standing. A motion for summary judgment will be granted if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). *See generally Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In this case, in light of the extensive filings of deposition testimony, affidavits, statements of material fact, numerous briefs and the hearing of oral argument, the standing issue may be more appropriately addressed on summary judgment. Thus, the burden is on defendants to show that there is no set of facts arising under the complaint upon which plaintiff can succeed. *See Huntington Branch,*

*N.A.A.C.P. v. Town of Huntington,* 689 F.2d 391, 395 n. 4 (2d Cir.1982).

The Supreme Court's fair housing decisions which involve standing issues instruct that a particular plaintiff's standing greatly depends upon which law is used as the predicate for suit. In this case, plaintiffs proceed under a myriad of different statutes. Most of plaintiffs' efforts at redress, however, emanate from Title VIII's Fair Housing Act provisions and the Civil Rights Act of 1866, as codified at 42 U.S.C. § 1982. These two statutes do not share the lowest common denominator for admission into federal court warranted by Article III of the United States Constitution. *Compare Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972) (holding Title VIII standing as broad "as is permitted by Article III of the Constitution" and extends to indirect victims of defendants' housing discrimination) *with Warth v. Seldin,* 422 U.S. 490, 512–14, 95 S.Ct. 2197, 2212–13, 45 L.Ed.2d 343 (1975) (standing to assert *Trafficante* claim denied under 42 U.S.C. §§ 1981, 1982, & 1983). However, at this point, it seems reasonable to this court to give plaintiffs the benefit of an Article III analysis of their claims before turning to any other jurisprudential limitations on standing.

■ Article III of the United States Constitution limits the jurisdiction of the courts to actual cases or controversies, one aspect of which is a plaintiff's standing to challenge the alleged wrong. The standing requirement generally is met only by a plaintiff with a personal stake in the outcome of the controversy, as measured by a distinct and palpable injury, which is causally connected to the conduct being charged against the defendant. *See Allen v. Wright,* 468 U.S. 737, 770, 104 S.Ct. 3315, 3334, 82 L.Ed.2d 556 (1984). Therefore, plaintiff must allege that he has suffered a "distinct and palpable injury" as a result of the defendant's action. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). Consequently, there are three elements of proof involved: injury, causation, and redressability. The plaintiff must (1)

personally have suffered "some actual or threatened injury" that is (2) caused by or "fairly can be traced to" the defendant's challenged action, which (3) "is likely to be redressed by a favorable court decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

■ In general, defendants' motions question whether plaintiffs have alleged sufficient facts to demonstrate a distinct and palpable injury. In this context, it is important to note that any allegations of abstract, hypothetical, or conjectural injury on plaintiffs' part are insufficient to impart the necessary standing to sue public entities or officials. *Biggs v. Block,* 629 F.Supp. 1574, 1577 (E.D.N.Y.1986).

■ In part, the question becomes one of whether plaintiffs have alleged sufficient injury in fact. However, in a steering or community-wide fair housing case such as this, plaintiffs' complaint may have to articulate with greater specificity the nature of the injury and how it was caused by the defendant's violation than would ordinarily be required. In fact, the Supreme Court has suggested the inclusion of more detail on the causation elements necessary to establish the plaintiff's standing to sue. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 376–78, 102 S.Ct. 1114, 1122–24, 71 L.Ed.2d 214 (1982); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 109–11, 99 S.Ct. 1601, 1612–13, 60 L.Ed.2d 66 (1979); *Warth,* 422 U.S. at 502–08, 95 S.Ct. at 2207–10. Only one plaintiff with standing is required for a case to be decided on its merits. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 263–64, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977).

■ Moreover, although a plaintiff may have alleged injury sufficient to obtain a hearing on the question of a defendant's liability for damages, that plaintiff may not have met the standard to be heard on a claim for injunctive or declaratory relief. *Id.; see also City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). The latter rule takes on particu-

lar importance in cases, like this one, which are filed as class actions.

■ The question of plaintiffs' standing in a class action suit does not end with the constitutional inquiry into an individual plaintiff's standing to raise issues generally. For example, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton,* 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). Additional qualifications of a class representative, pursuant to Fed.R.Civ.P. 23, must also be met. A plaintiff must have, assuming common issues, individual standing to raise those common issues.

## I. STANDING CHALLENGE TO THE FIRST AMENDED BELMONT COMPLAINT

■ Plaintiffs Jessie Comer and Jewel Culverhouse are minority, low-income residents of the City of Buffalo. The contention is that each plaintiff is eligible for Section 8—Existing Housing subsidies administered by defendants HUD, Belmont, and Amherst. Plaintiffs allege that many of defendants' policies, practices, and procedures discriminate against them on the basis of their minority race and have contributed to the creation and perpetuation of segregated housing patterns throughout Erie County.

Among all of the policies complained of, plaintiffs target two in particular in this complaint. The first policy provides local residency preferences to Section 8 program applicants who reside or work in the suburbs surrounding the City of Buffalo. Secondly, plaintiffs allege that Belmont failed to conduct an adequate outreach program. The court will discuss the outreach issue, common to both the Belmont and RAC complaints, in section III of this order.

### A. The Local Preference Claim

The Section 8 housing program was enacted for the purpose of aiding lower income families to obtain housing assistance payments for existing newly constructed and substantially rehabilitated housing. 42 U.S.C. § 1437f. Defendant Belmont is the public housing agency (PHA) of defendant Town of Amherst and serves as the administrator of a consortium of 41 communities in Erie County, New York. There are presently three Section 8 programs administered by Belmont: the certificate program, the housing voucher program, and the moderate rehabilitation program. The rehabilitation program is not at issue in this suit.

Under the certificate program, persons entitled to rental assistance may receive assistance for an apartment of their choice within certain geographical limits established by HUD. Individuals pay no more than a set percentage of their combined monthly income toward rent and utilities.

Under the voucher program, individuals may use their rental assistance subsidy anywhere in Erie County. There is no limit on the amount of rent a tenant pays, since the tenant must contribute the shortfall between the amount of rent and the subsidy, which is based on a "payment standard" established by HUD.

As with most public assistance programs, there are more applicants than funds available for assistance. Consequently, defendant Belmont devised a waiting list for all Section 8 applicants. Under this system, priorities are assigned to each applicant based upon various claims of preference. The first priority is given to an applicant who qualifies for a "federal preference" as defined in 24 C.F.R. § 882.219. To qualify, an applicant must prove to be: (a) involuntarily displaced; (b) living in substandard housing; or (c) paying more than fifty (50) percent of gross family income toward rent and utilities. Proof of any one of the three factors noted yields a federal preference. *Id.*

According to HUD regulations, Belmont may incorporate other non-federal preferences, including the use of a "local preference," designed to rank applicants on the waiting list who are qualified for a federal preference. For example, Belmont may give precedence to those applicants who qualify for both a federal preference and a local preference over non-resident applicants who hold only federal preferences. *See* 24 C.F.R.

§ 882.2199(b)(1) & § 882.219(b)(2)(iii)(A). However, there are several limitations. Local residency preferences may not be based on the length of time an applicant has resided in the jurisdiction. An applicant who is working, or who has received notice to begin work in the local jurisdiction, must be treated as a resident. *See* 24 C.F.R. § 882.-209(a)(4)(i).

Belmont gives local preference to any eligible applicant either living, working in, or intending to work in any of the 41 communities of the Erie County consortium. Belmont incorporates its local preference in accordance with the following priorities:

*Priority 1:* Applicants claiming both federal and local preferences;

*Priority 2:* Applicants claiming federal preferences only;

*Priority 3:* Applicants claiming local preferences only;

*Priority 4:* Applicants claiming no preferences.

Item 119, Huckabone Aff. at 4, ¶ 11.

Belmont maintains that, as a consequence of the large number of applicants on the waiting list, housing subsidies reach only those applicants who qualify for a federal preference, that is, those applicants ranked in Priorities 1 and 2. According to Belmont, applicants claiming only local preferences in Priority 3, and those who lack any preference at all in Priority 4, will not obtain housing assistance given the present levels of funding available for the program administered by Belmont. *See* Item 157 at 14–17; Item 156.

Defendants move to dismiss the complaint of Comer and Culverhouse because neither have suffered any injury as a consequence of any activity on defendant Belmont's part. Defendants contend that these plaintiffs lack standing to sue on behalf of themselves or any of the members of the proposed class.

1. *Injury and Federal Preferences*

Defendants maintain that, given the limited resources available for Section 8 assistance, a successful Belmont applicant must qualify for a federal preference in order to have a realistic prospect for obtaining Section 8 assistance. Item 123 at 9. In essence, defendants argue that the deficit of a federal preference "dooms" an applicant's chances of obtaining Section 8 assistance. *Id.* at 10; *see generally* Items 156 & 119, Huckabone Affs. Plaintiffs generally disagree with this argument, maintaining that neither a plaintiff's position on a waiting list nor the indeterminacy of available federal financing works to defeat standing. Item 134 at 24–25; *see Price v. Pierce,* 823 F.2d 1114, 1118 (7th Cir.1987); *Huntington Branch v. Town of Huntington,* 689 F.2d 391, 394–95 (2d Cir. 1982). In fact, the cases upon which plaintiffs rely do not speak in absolutes. Both *Price* and *Huntington Branch* refer to a "reasonable probability" that a plaintiff would receive assistance sooner if successful in the suit. *See Price,* 823 F.2d at 1118–19. The facts of the instant case do not support a reasonable probability that should plaintiffs succeed in eradicating Belmont's local preference, they would receive assistance from Belmont any sooner. Moreover, it is not merely a matter of plaintiff's position on a waiting list, taking a long while to reach the top. Here, the plaintiffs cannot even demonstrate that they qualify, or that there is any prospect of future qualification to be on the two lists which offer a reasonable probability of reaching the top. In any event, if in the future plaintiffs do qualify for a federal preference, they would be entitled to reapply at Belmont and be enrolled on the federal preference lists.

Nevertheless, Ms. Comer and Ms. Culverhouse each have claimed, on Section 8 applications, to reside in "substandard housing," a federal preference category. *See* Item 119, Ex. A at 29, Ex. B, Ex. C at 34– and Ex. D. Ms. Comer indicated that her housing situation was dilapidated due to high lead levels, and Ms. Culverhouse represented that a governmental agency declared her apartment unfit for habitation. *See* Item 119, Ex. B & Ex. D. Defendants argue that neither plaintiff qualifies for a federal preference for substandard housing, because neither produced any evidence that a landlord or governmental agency declared their individual apartment units unfit for habitation, either at the time of their initial applications or now. *See* Item 119, Ex. A at 14, Ex. C at 37–38, 42–43.

Whether housing is considered "substandard" is determined by definitive regulations. *See* 24 C.F.R. § 882.219(f) (defined); § 882.-219(g) (verification). Plaintiffs incorrectly read the regulations to permit subjective allegations of federal preference. The PHA must accept an applicant's "certification" of substandard housing, *unless* it verifies that the applicant is not qualified for preferred status. 24 C.F.R. § 882.219(c)(2). HUD regulations provide that the administrator of a PHA may verify preferences either at or about the time the application is accepted or later when the applicant is accepted for receipt of public housing assistance. 24 CFR § 882.219(c)(2) & (3). Here, the PHA exercised discretion to immediately challenge and verify the claim of substandard housing and rejected it. In fact, a verification investigation was conducted for the sole purpose of determining plaintiffs' standing in this case. Item 188, Hearing Tr. at 122.

Plaintiffs' theory that it is acceptable for applicants to claim a federal preference based only upon their subjective belief that they deserve one is without merit. As noted, determinations of substandard housing are important because the results focus on whether or not applicants are entitled to a federal preference. If plaintiffs' proposition is found to be acceptable, there would be no need at all for ranking or maintaining weighted waiting lists. Everyone would enjoy the benefit of being on a "priority" federal preference list. In fact, there would no longer be a need for the federal preference structure, since housing assistance lists would reflect the entire universe of applicants on a first-come, first-served basis.

Contrary to plaintiffs' allegations concerning Belmont's allegedly restrictive local preference policy, plaintiffs' main problem in obtaining Section 8 assistance is attributable to their inability to verify the *bona fide* existence of a federal preference. Accordingly, neither named plaintiff has established the requisite standing to challenge Belmont's local preference structure.

## II. STANDING CHALLENGE TO THE FIRST AMENDED RAC COMPLAINT

■ Plaintiffs allege two claims against defendant RAC. First, plaintiffs claim that RAC has a policy which prohibits households holding Section 8 certificates from using those certificates outside the City of Buffalo, as a result of which lower-income minority households have been unable to move to suburban areas of Erie County. Second, plaintiffs contend that RAC has failed to conduct an adequate affirmative outreach program as required by federal regulation. As noted in the Belmont discussion, the outreach issue, common to both Belmont and RAC, will be explored in the next section of this order.

## A. The Section 8 Claim

Before reviewing the plaintiffs' claims against individual standing requirements, it is important to point out that defendant RAC maintains that its policy never restricted Section 8 certificates to the City of Buffalo. RAC explains that its policy toward Section 8 certificates was to provide any certificate holder who wished to live outside the City with a voucher which could be used in any PHA operating a voucher program (such as Belmont), subject to availability. If no vouchers were available, the individual desirous of leaving the City would be put on a waiting list for a voucher and issued a voucher as soon as one with the correct bedroom size became available. Item 117, Fanelli Aff. at 6–7.

Moreover, on July 2, 1990, HUD issued a notice to all Section 8 PHAs, interpreting the Housing and Community Development Act of 1987. HUD directed all PHAs to advise certificate holders that they could move within the same metropolitan statistical area (MSA) of the PHA or a contiguous MSA. Item 117, Ex. A. In fact, as a result of the new policy established by August 1990, certificates issued by RAC could be used anywhere, effectively mooting the claim at issue. In any event, the court will review the facts as they pertain to the individual plaintiffs.

### 1. Jessie Comer

Jessie Comer alleges, as a black resident of Kenfield Homes, that she was deprived of the opportunity to obtain RAC housing. In particular, she claims that the Section 8 pro-

gram restricted the use of certificates to the City of Buffalo. Item 69 at ¶ 61. At her deposition, Ms. Comer testified that she did not apply for RAC assistance after leaving public housing because she "did not want to go through the long wait." Item 117, Ex. I at 16. She has also stated that she has no pending application with RAC because she has applied for a Belmont subsidy. Item 133 at 18; Item 135, Ex. F at 17. Ms. Comer further disavowed any current intention of applying for a RAC subsidy, although she implied that she might apply to RAC if she is wait-listed at Belmont. Item 117, Ex. I at 17–18. However, she is also now allegedly willing to move to the suburbs even if it means giving up her job as a substitute Buffalo teacher. Item 133 at 18–21 & n. 10. Her contention that she has standing to raise the claims alleged in the first amended complaint is without merit. Ms. Comer has no standing to challenge a RAC policy that she was not interested in or at best supports only a speculative interest.

### 2. *Hazel Grimes*

Ms. Grimes alleges that the Section 8 program, as administered by RAC, restricted the use of certificates to the City of Buffalo. Item 69 at ¶ 61. She argues that she was "categorically eligible" for a Section 8 subsidy from 1976 through 1984, and during 1986 and part of 1987, because she had minor dependents. Item 133 at 10. Though not alleged in the complaint, Ms. Grimes contends that she was also qualified for RAC's program in 1988–89 because she was disabled. *Id.* Ms. Grimes applied for Section 8 assistance on April 14, 1989. Item 154 at 10. Ten days after receiving her application, RAC notified Ms. Grimes that her application was denied since she had applied for assistance as an individual. The notice said that she must either be elderly, certified as handicapped, or disabled to receive Section 8 assistance. *Id.* at 11; Item 117, Fanelli Aff., Ex. H. She was advised of her right to appeal this decision, but she never did. *Id.* She claims only to have received a general rejection notice, and not one which referred to elderly, handicapped, or disabled categories. Item 133 at 12. She never reapplied or appealed.

Evidently, Ms. Grimes was rejected for Section 8 assistance because she was not certified as handicapped or disabled and did not meet the age requirement. Item 133 at 11 and Item 117, Fanelli Aff., Ex. H. Moreover, Ms. Grimes argues that the preliminary application form did not request any information pertaining to an applicant's medical condition. Item 133 at 14. She maintains that she was eligible for a federal preference as a "disabled person" as long as she would qualify for benefits under the Social Security Act, 42 U.S.C. § 423, regardless of whether she was receiving benefits. Accordingly, plaintiffs assert that Ms. Grimes considered herself disabled, and was entitled to demonstrate her eligibility with whatever medical evidence she could produce.

Moreover, plaintiffs say that formal certification is not required by law. According to HUD's "Public Housing Agency Administrative Practices Handbook for the Section 8 Existing Housing Program," disabled status can be verified by a doctor's statement or other reliable medical source. If, however, an applicant receives SSI benefits, then the administrator need not verify the status. Item 133 at 14 n. 9. Ms. Grimes argues that RAC peremptorily denied her eligibility for its Section 8 program on the basis of an application which contained no information about an applicant's disability status. She alleges that RAC wrongfully denied her application, and her failure to reapply cannot be used as a means to defeat standing. Item 133 at 13–15.

In her complaint, she does not allege that RAC unfairly denied her assistance based on her medical condition. From the affidavits, exhibits, depositions, and briefs submitted, the court concludes that Ms. Grimes is not currently on any Section 8 waiting list and cannot now challenge a RAC program for which she has been determined to be ineligible. At this point, Ms. Grimes cannot secure relief should plaintiffs ultimately prevail in this lawsuit.

### 3. *Yvonne Primm*

Yvonne Primm is a black disabled recipient of Supplemental Security Income. Item 133

at 25; Item 135, Ex. H at 13. At all relevant times she has lived with her son, who was born in 1972. *Id.*, Ex. H at 5–6. Ms. Primm applied for a Section 8 subsidy in 1983 from HCNF, RAC's predecessor. *Id.*, Ex. H at 8–9. She received notification of her eligibility in 1987. *Id.*, Ex. H at 15. At an orientation session, she allegedly was advised that she could use her subsidy only within the City. The administrator at the session referred to the subsidies as "certificates". Upon receiving her subsidy, she was confused as to whether she had a voucher or a certificate. Ms. Primm now understands that she had received a voucher in 1987. Item 133 at 25–26, Item 133, Ex. H at 18–19, 21–22, 38, 48, 49, 57 & 59.

Of all the papers she received in connection with the subsidy, only one document explained, in its final pages, that a voucher could be used anywhere an applicant chose to live. Item 135, Ex. H at 32. Moreover, when provided with lists of available housing by HCNF or RAC, almost all of the available apartments were on the East side of the City, where an overwhelming concentration of minorities reside. Only a handful of apartments on the list were located outside of the City. Armed with only a ninth-grade education and misleading program information, she contends that she never undertook the effort to seek housing outside the City. Therefore, she concludes that being denied the choice of suburban housing and a wider range of economic, social, and educational opportunities, she has suffered sufficient injury to support her standing. *See* Item 69, Compl. ¶ 137; Item 133 at 25.

While Ms. Primm may have been confused initially as to whether she had a voucher or certificate, she now acknowledges that she was issued a voucher, and understands that she may use it anywhere. Item 133 at 23, Item 135, Ex. H at 37. In fact, Ms. Primm has admitted that she had a copy of the voucher issued to her, in 1987, in her own file. Item 117, Ex. B at 38–39. Ms. Primm has never attempted to move outside of Buffalo, has no current plans to move to the suburbs, and finally said that she was planning to move to Detroit. *Id.* at 38–40.

Her complaint fails to include an allegation about RAC's voucher program. The only program challenged in the complaint is defendant RAC's certificate program. *See* Item 69 at ¶ 57; Item 154 at 6–7. Ms. Primm has always held a voucher, not a certificate, that could be used anywhere. As only a voucher recipient, Ms. Primm has no standing to challenge the alleged restrictive-use policies of the certificate program. *See United States v. SCRAP*, 412 U.S. 669, 688–89, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973).

### 4. *Felicia Stokes*

Felicia Stokes, a recipient of RAC Section 8 subsidies, alleges that since she first received RAC housing assistance, RAC has informed her, as recently as June 1990, that she could use her subsidy only within the City of Buffalo. Item 69 at ¶¶ 95–96. She applied for a Section 8 subsidy on April 28, 1989, and received her subsidy after only 2 months because she became involuntarily displaced after a fire in her apartment. Item 133 at 6 n. 7. However, at her deposition, Ms. Stokes admits to first applying in 1988. Item 135, Ex. I at 7. She testified that, at an orientation session, she was instructed by RAC that she could use her certificate only within the City, not in the suburbs, and that she was not advised of the voucher program which could be used outside the City. Item 135, Ex. I at 34–35. In addition to her orientation session, Ms. Stokes participated in several other Section 8 briefing sessions, the last of which she attended in June 1990. At each session, she allegedly was advised that her subsidy could only be used within the City. She also testified that she was never given any information about other housing programs which might allow her to move outside the City. Item 133 at 8; Item 135, Ex. I at 35–36. Under these circumstances, it is asserted that Ms. Stokes has standing to pursue her claims.

Defendants argue, contrary to plaintiffs' characterization of deposition testimony, that Ms. Stokes has no present desire to leave the City even though she had indicated that, at one time, "she would have liked to" live outside the City. *See* Item 117 Ex. G at 17

& 25 and compare Item 135, Ex. I at 21. Moreover, prior to RAC's August 1990 change in the certificate program, RAC had a policy allowing any certificate holder who wished to move outside Buffalo to exchange that certificate for a voucher that could be used anywhere. *See* Item 117, Fanelli Aff. at 5–9. Accordingly, RAC contends that its former policy on Section 8 certificates did not restrict housing choices to the City.

At her deposition, Ms. Stokes testified that she initially sought City housing only, that she never sought to transfer her subsidy outside the City, that she had no current desire or intention to move outside the City, and that she is currently content with her present housing and relationship with RAC assistance. Item 118 at 14; Item 117, Fanelli Aff. Ex. G.; Item 135, Ex. I. Looking at plaintiffs' allegations, it becomes clear that Ms. Stokes currently has no genuine stake in the outcome of the lawsuit against RAC. While RAC's former policy was in effect, Ms. Stokes failed to make any inquiry to move outside of the City. Since the policy was changed, in August 1990, she would be free to take her certificate and move anywhere she chooses. Accordingly, this court can find no injury in fact and no threat of future injury capable of remedy through affirmative injunctive relief.

### III. OUTREACH ISSUES IN THE RAC & BELMONT ACTIONS

Belmont plaintiffs, Jessie Comer and Jewel Culverhouse, together with RAC plaintiffs, Jessie Comer, Hazel Grimes, Yvonne Primm, and Felicia Stokes, contend that they have standing to challenge defendants' breach of their affirmative obligation to further fair housing. Each plaintiff has alleged that she has been denied a subsidy as a result of defendants' inadequate outreach or notification efforts. However, to the extent RAC plaintiff Yvonne Primm holds only a voucher, and the RAC complaint fails to challenge the voucher program as administered by RAC, Ms. Primm's outreach allegations are immaterial, as she lacks standing to challenge RAC's certificate program, the gravamen of the complaint.

▆ Defendant Secretary of HUD must administer the programs and activities relating to housing, under Title VIII, "in a manner affirmatively to further the policies" of fair housing. 42 U.S.C. § 3608(e)(5) (1992 pocket part). As Section 8 contract agents, RAC and Belmont each administer a federal program funded by defendant HUD. Thus, the duty imposed on the Secretary extends "through him" to "other agencies administering federally-assisted housing programs." *Otero v. New York City Housing Authority,* 484 F.2d 1122, 1134 (2d Cir.1973). Additionally, as recipients of federal funds, RAC and Belmont each have an obligation, under Title VI, to administer their respective Section 8 programs in a manner that includes the participation of minorities. 42 U.S.C. § 2000d–4a(1)(A) (1992 pocket part).

With respect to the Section 8 Existing Housing program, affirmative outreach requirements are set out in various parts of Title 24 of the Code of Federal Regulations. For example, PHAs are encouraged to promote greater choice of housing opportunities by seeking the participation of owners in areas where the PHA may enter into contracts; by advising families of opportunities to lease housing in those areas; and by cooperating with other PHAs to develop programs to give certificate holders the opportunity to seek housing in a wide area and enable certificate holders to move from one PHA to another. 24 C.F.R. § 882.103(c) (1992).

In its administration of a Section 8 Existing Housing Certificate Program, a PHA must make known to the public, through publication in a newspaper of general circulation as well as through minority media and other suitable means, the availability and nature of housing assistance for lower-income families. 24 C.F.R. § 882.207 (1992). In addition, the PHA "shall take affirmative action to provide opportunities to participate in the program to persons who, because of such factors as race, ethnicity, sex of household head, age, or source of income, are less likely to apply" for certificates. *Id.*

Similarly, under a PHA's voucher program, the PHA must announce the availability of assistance in the local newspaper of

general circulation, as well as through minority media and other suitable means. The PHA must provide this notice when it establishes a waiting list, reopens a waiting list, and at other times as necessary to ensure maximum use of the housing assistance. 24 C.F.R. § 887.107 (1992). Moreover, the PHA must make a concerted effort to elicit participation in the Housing Voucher Program by owners, real estate agents, and other local membership groups interested in housing for lower income families. 24 C.F.R. § 887.109 (1992).

Belmont and RAC acknowledge that, at the time new allocations are received from HUD, they are obligated to provide notice of housing assistance availability to the public through newspapers and other suitable means. *See* Items 123 at 6 and 119 Ex. E (Belmont); Item 118 at 22 (RAC). Belmont argues that it has complied with the relevant federal requirements. Item 123 at 6–8.

### A. *Belmont's Outreach Program*

■ In 1977 and 1978, Belmont conducted a county-wide outreach program consisting of paid advertising in general circulation newspapers, local weeklies, minority weeklies, and radio and television announcements. By 1979, Belmont recounts that its waiting list had grown to the point where, but for emergency applications, the intake of new applications was suspended and the campaign of paid advertising curtailed. The waiting lists burgeoned throughout the next decade, only to experience the most significant increases in the latter part of the decade. Despite the limitation of accepting only emergency applications, Belmont directed outreach efforts, in recent years, to government and community service organizations. Belmont explains that, in light of its limited resources, it now chooses to conduct its outreach measures through the use of newsletters, other publications, and staff involvement in community lectures, coalitions, and service groups. Belmont concludes that its current outreach efforts increase Belmont's visibility and promote a general understanding of its services among governmental agencies and other public service entities. Item 123 at 6–8. The court finds these activities

sufficient to earn compliance with the regulations.

■ Moreover, in the Belmont case, deposition testimony demonstrates that Belmont plaintiffs Jessie Comer and Jewel Culverhouse were intimately acquainted with the operations of Belmont Shelter for many years predating this lawsuit. *See* Items 119, Ex. A & C and 117 Ex. I. This is an additional reason why these plaintiffs may not proceed against Belmont on their outreach claim.

#### 1. *Jesse Comer and Belmont Outreach*

The depositions of plaintiffs Comer and Culverhouse make clear that each was personally aware of Belmont's housing assistance programs. Ms. Comer admitted that she understood, as of 1985, that Section 8 assistance "help[ed] you pay the rent ... [and] ... get a nice house." Item 119, Ex. A at 14. She also knew, as of 1988, that her brother's girlfriend received Section 8 assistance, *id.,* and knew of others getting Section 8 assistance. Item 117, Ex. I at 13–15. She worked as an intern at Haven House, a shelter for battered women which made referrals to Belmont. Item 119, Ex. A at 15–17, 19, 79. She had contacts with several other organizations which utilized Belmont's services. Item 119, Ex. A. Based upon the record, and contrary to her allegations in this complaint, it is clear that Ms. Comer knew of the availability of Section 8 assistance prior to her commencement of this lawsuit.

#### 2. *Jewel Culverhouse and Belmont Outreach*

Ms. Culverhouse was also aware of Section 8 assistance sometime during 1979 or 1980, while living in various public housing projects and shelters. Item 119, Ex. C at 10 & 15. She admits learning enough about the Section 8 program from friends at the projects to know that once an application was made, a certificate would follow to obtain a partial rent subsidy. *Id.* at 15. She knew of friends who were receiving Section 8 assistance. *Id.* at 16. She had knowledge of Belmont's Section 8 subsidies as far back as 1980 or 1981, some 10 years before the onset of this lawsuit. *Id.* at 22. In 1986, she applied for

employment at Belmont. *Id.* at 21–23. In 1989, while a resident at a Salvation Army shelter, she applied for the Section 8 program through both RAC and Belmont. *Id.* She submitted her first Section 8 application to Belmont, upon learning of its emergency assistance program, in March 1989. *Id.* at 19–20. Initially, she was told over the phone that she could obtain Belmont assistance due to her homeless situation. *Id.* at 26. However, she testified that after filling out the application, the Belmont receptionist told her that since she did not live or work in the suburbs she would not be able to obtain assistance from Belmont. *Id.* at 25. Frustrated, she withdrew her application and never reapplied. Assuming her testimony to be correct, the record is clear that Belmont extensively promoted its program. The fact that a receptionist may have inaccurately or insufficiently explained a Belmont or federal regulation is not sufficient alone to confer standing. Ms. Culverhouse was, after all, personally aware of the existence of the Section 8 program, but took no steps to see to it that the misunderstanding was corrected.

## B. *RAC's Outreach Program*

RAC has no records of advertising prior to 1986, due to HDC's record retention policy. However, according to affiant Peter Filim, who was originally employed by HDC in 1981 and continued to work for RAC after 1989, it was the company's policy to advertise the availability of Section 8 housing whenever the waiting list was opened. Item 117, Filim Aff. ¶ 5 at 2. The procedures used by HDC in 1986, for example, included the use of five separate application centers, the notification of all Common Council members, and public service announcements both broadcast over local radio stations and published in numerous neighborhood and community center newsletters. *Id.* ¶ 7 and Ex. K & L. A notice was published in *The Buffalo News* in both English and Spanish. *Id.* ¶ 7 and Ex. J. In 1987 and 1988 when the lists opened again, similar procedures were followed. *Id.* ¶¶ 8 & 9 and Ex. D & N. Since 1988, the waiting list has been open on a continuous basis. Moreover, as of August 1990, RAC's waiting list has been combined with the BMHA waiting list. Accordingly, if a person

applies at BMHA, they are automatically placed on the waiting list at RAC, and vice versa.

While plaintiffs have cited the relevant federal outreach regulations in support of their allegations in the complaint, this court agrees with defendants that the regulations do not provide for individual notice of the availability of Section 8 housing to either BMHA residents or applicants. I find RAC's outreach efforts to be in compliance with HUD's outreach regulations, and that the RAC plaintiffs were well acquainted with RAC's programs before initiating this suit and suffer no palpable injury as a result of RAC's outreach efforts. Further, an analysis of the particular information held by each plaintiff shows that each was well aware of the programs offered by the defendants. Much of this information was set forth previously but for clarity will be repeated.

### 1. *Jesse Comer and RAC Outreach*

Ms. Comer alleges that while she resided in public housing in 1983, defendants failed to advise her that she could apply for Section 8 rental housing administered by defendant RAC. Item 69 at ¶ 83. She claims that defendants did not advise her that a Section 8 subsidy could be used to obtain rental housing in areas outside those with high minority concentrations, either in the City of Buffalo or in its suburbs. *Id.* at ¶ 84. She testified that had if she had received information, she would have rather lived in a private home than in the projects. Item 133 at 17; Plaintiffs' Ex. F at 41–43, 46–47. The essence of Ms. Comer's argument is that if she had information in 1979 or 1981, when there was no waiting list, then she would have been able to make an informed decision and reap substantial economic benefits by moving to the suburbs.

However, aside from any problems with the statute of limitations and contrary to these allegations, Jessie Comer has since admitted to familiarity with the availability of the Section 8 program for several years prior to the commencement of this suit. Item 117, Ex. I at 13. She also testified that while she did not know of the Section 8 program before

moving into public housing in 1979, she did not apply after moving into public housing in 1983, because she "did not want to go through the long wait." *Id.* at 16.

Given the facts provided by Ms. Comer's own testimony, this court concludes that she has suffered no injury as a result of any alleged lack of opportunity to seek RAC assistance. Nor is Ms. Comer harmed by defendants' alleged failure to inform her directly about a rental assistance program with which she was already familiar. Finally, she has not articulated a desire to seek a RAC subsidy, nor is she able to qualify for a federal preference as the means of obtaining one. She has no standing to pursue a challenge against RAC's Section 8 outreach program.

### 2. *Hazel Grimes and RAC Outreach*

Hazel Grimes has lived in Langfield Homes, a predominantly minority-occupied BMHA project, since 1966. She alleges that she was deprived of the opportunity to obtain RAC housing. Like Ms. Comer, she maintains that while she lived in public housing, defendants neither advised her of Section 8 assistance, Item 69 at ¶ 87, nor informed her that Section 8 subsidies could be used in areas outside of high minority concentrations. *Id.* at ¶ 88. She argues that had she received information in 1984, she would have been able to make an informed decision about which program to select, Section 8 or public housing, and where she desired to live. Item 133 at 10.

Ms. Grimes contends that she was "categorically eligible" for Section 8 assistance at all times, either because of the existence of minor dependents or because of a disability for which she had applied for Supplemental Security Income (SSI) benefits in 1988. After finally discovering the Section 8 program by communications with friends and family, she received a preliminary Section 8 application from RAC. Item 133 at 11; Item 135, Ex. G at 33–34. Ms. Grimes applied for the program on April 14, 1989. Item 154 at 10. Ten days later, RAC dispatched a letter to Ms. Grimes, indicating that her application was rejected because she had applied as an individual. A single individual must either

be elderly, handicapped, or disabled to receive Section 8 assistance. *Id.* at 11; Item 117, Fanelli Aff., Ex. H. Ms. Grimes was also advised of her right to appeal this decision, but she never did. *Id.* As a practical matter, Ms. Grimes cannot at the same time allege that she had no knowledge of the Section 8 program and that her application to the program was unfairly rejected. She not only knew about the program since 1988 but also applied for it. Moreover, Ms. Grimes' alleged claim of wrongful denial appears nowhere in the RAC complaint. At this point, Ms. Grimes cannot secure relief should plaintiffs finish this suit as the victors. Therefore, to the extent Ms. Grimes cannot demonstrate any injury in fact flowing from her allegations, she lacks the requisite standing to sue.

### 3. *Yvonne Primm and RAC Outreach*

Ms. Primm applied with RAC's predecessor for Section 8 assistance in 1983. Four years later she was awarded a voucher. Despite plaintiffs' claims that Ms. Primm did not know that she could use the voucher anywhere she chose, it was not because of RAC's failure to convey the message. Ms. Primm was in possession of her voucher, which was clearly labeled as such, at all relevant times. Apart from her lack of participation in the challenged certificate program, it is clear that she has not suffered any injury in fact as a result of defendants' outreach efforts.

### 4. *Felicia Stokes and RAC Outreach*

Ms. Stokes admits that she was first informed of RAC's housing assistance program by her landlord in 1988 and received a subsidy relatively quickly. Item 135, Ex. I at 7. As discussed above in section II of this order, Ms. Stokes testified that she is content with the treatment which she received from RAC through the years of her dealings and has no current desire to move outside the City of Buffalo. Consequently, she has not suffered any palpable injury.

Accordingly, summary judgment on the outreach claims of both the Belmont and RAC plaintiffs is granted, and the claims are dismissed.

## IV. *STANDING CHALLENGE TO THE FIRST AMENDED BMHA COMPLAINT*

 The named plaintiffs in this action include Jessie Comer, Rosemary Comer, Jewel Culverhouse, and Hazel Grimes.[2] Defendants include the BMHA; the City of Buffalo and its Mayor, James D. Griffin; the Commissioner of the New York State Division of Housing and Community Renewal, Richard L. Higgins; and the federal defendants, HUD and its former Secretary, Jack Kemp.[3] The plaintiffs generally allege that the defendants, through their policies, practices, and procedures, have created and perpetuated racial discrimination within their federally and state funded low-income public housing projects. It is alleged that defendants' practices have resulted in the untenable situation where 24 of the 29 public housing projects administered by defendants are almost exclusively occupied by either minority residents or white residents. Plaintiffs further charge that, despite their legal obligation to do so, defendants have not affirmatively promoted fair housing, nor taken action to remedy or avoid the effects of racial discrimination and segregation. Item 70, ¶¶ 1–3.

Some or all of the defendants are alleged to have violated plaintiffs' Fifth Amendment property rights and their federal civil rights pursuant to 42 U.S.C. §§ 1981, 1982, and 1983; Title VIII of the Civil Rights Act of 1968, also known as the Fair Housing Act of 1968, as codified at 42 U.S.C. §§ 3604, 3608; Title VI of the Civil Rights Act of 1964, as codified at 42 U.S.C. § 2000d; and the United States Housing Acts of 1937 and 1968. Plaintiffs also claim that the City defendants have violated statutory and regulatory duties imposed as a recipient of Community Development Block Grant [CDBG] funds. In addition, a number of pendent state claims are alleged against the non-federal defendants. Finally, due to an alleged unlawful conversion of two public housing projects, plaintiffs allege that the non-federal defendants have violated plaintiffs' federal civil rights.

As a result, plaintiffs seek declaratory and extensive affirmative and prohibitive injunctive relief from all defendants. Plaintiffs also request compensatory and punitive damages.

The federal defendants maintain that the BMHA complaint should be dismissed only in part. In addition to challenging plaintiffs' individual standing, certain defendants also challenge plaintiffs' standing to represent a class. Moreover, the federal defendants correctly argue that all four of the named plaintiffs lack standing to sue on behalf of the elderly. Item 114, Federal Defendants' Memorandum, at 11. Defendant BMHA similarly argues that plaintiffs do not have standing. Item 115, BMHA's Memorandum, at 16; Items 234, 259, and 260. Defendant Higgins contends that none of the named plaintiffs possesses the requisite standing to sue on behalf of the purported class. Item 130, Defendant Higgins' Memorandum.

### A. INDIVIDUAL STANDING OF PLAINTIFFS

#### 1. *Rosemary Comer*

Rosemary Comer is a black single mother who, as a child, lived in the Ellicott Mall public housing project from 1960 until 1966. Personal and economic circumstances forced her to obtain housing in Langfield Homes, a BMHA public housing project, in 1987. Two years later, she decided to leave the project for private housing, allegedly on account of the project's physical conditions, increasing criminal activity, and predominant pattern of racial segregation. Ms. Comer's move to private housing, where she continues to live, occurred four months prior to the filing of this lawsuit.

Defendant HUD argues that Ms. Comer has no "real and immediate" injury sufficient to confer standing because she has not resided in BMHA public housing since 1989 and she has no present intent to return. *See Rizzo v. Goode*, 423 U.S. 362, 372, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976). Defendant

---

**2.** A fifth named plaintiff, Annette McCutcheon, has since withdrawn from the action.

**3.** The claims against the former executive director of BMHA, Lawrence Grisanti, were withdrawn and discontinued without prejudice. Item 202.

also argues that the "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). She is not entitled to seek prospective equitable relief absent the requisite showing of a real and immediate threat of future injury. *See Biggs v. Block*, 629 F.Supp. 1574, 1578 (E.D.N.Y.1986); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

Plaintiffs object to defendant HUD's argument on two basic points. First, plaintiffs find fault with defendant's reliance on police brutality cases which involve different issues than housing cases. This contention, as far as this particular inquiry into standing is concerned, is meritless. *See Biggs*, 629 F.Supp. at 1578. Second, plaintiffs read one district court's opinion, rejecting application of the *Lyons* case, to apply to all housing discrimination cases. *See Young v. Pierce*, 628 F.Supp. 1037, 1059 (E.D.Tex.1985). The court in *Young* had before it a very different set of circumstances than found in this case. For example, the plaintiffs in *Young* were already certified as a class. In particular, the *Young* plaintiffs, unlike those in this case, were all current applicants for public housing programs in the areas of their residence at the time of the court's inquiry into standing. *See Young*, 628 F.Supp. at 1059; and *Young v. Pierce*, 544 F.Supp. 1010, 1012 (E.D.Tex. 1982).

Insofar as Ms. Comer seeks compensatory damage for alleged past discrimination on the part of BMHA, she may individually maintain such claims. However, since Ms. Comer has not alleged any desire to return to the public housing system, she has failed to indicate how her alleged injury is likely to be redressed by the equitable injunctive relief sought. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Her claims for such relief are, therefore, dismissed.

### 2. *Jessie Comer*

Jessie Comer is a 31–year–old black single mother of two children. Her complaint alleges that she applied for public housing with BMHA in 1983 and was given the limited choice of residing in one of three predominantly minority-occupied housing projects. Item 70 at ¶ 173. She contends that upon applying for public housing, defendants attempted to steer her into minority-occupied Frederick Douglas Towers. Item 132 at 23. BMHA records, however, indicate that Ms. Comer first completed a dwelling application on June 6, 1984. Moreover, on her dwelling application, she expressed a choice among those projects within which she wished to live. She set forth a desire to be near her mother at the federally assisted Lakeview Project. At her first deposition, she said that she had met with a BMHA employee the following year, who showed her a list of projects which presented her with better chances for move-in availability. She indicated that the primarily minority-occupied Frederick Douglas Towers was on the list. Comer Deposition, August 23, 1990. Subsequently, BMHA offered her a two-bedroom apartment at Langfield Homes on December 26, 1985, which she accepted. Item 40, Aff. of Susan Grezechowiak; Item 130 at 6.

Ms. Comer is alleged to reside in BMHA operated Kenfield Apartments. Item 70 at ¶ 173(g). However, on May 1, 1992, a judgment of possession was granted against Ms. Comer for non-payment of rent. Item 234, ¶¶ 9–10. When the City Court Marshall appeared to execute the warrant, on May 15, 1992, Ms. Comer had already vacated the apartment. Her present whereabouts are unknown. *Id.*, ¶ 12. Plaintiffs, however, contend that Ms. Comer was forced to flee public housing for the safety of her children. Item 246, ¶ 27. The court must discount the argument of plaintiff's counsel to the extent that the record fails to establish this proposition. *See* Item 260, ¶¶ 19–23 & att. ex.

Inasmuch as Ms. Comer is neither a current resident nor an applicant for BMHA public housing, she does not have standing to pursue prospective relief. She may, however, individually proceed in the suit on her

claims for monetary damages as a result of alleged past discrimination.

### 3. *Jewel Culverhouse*

Jewel Culverhouse is a black former resident of a number of projects owned, maintained, and administered by BMHA. Ms. Culverhouse originally applied for housing with BMHA in 1981 and was placed in Kenfield Homes in 1982. Item 40, ¶ 22, Grezechowiak Aff. However, in 1983, she transferred at her own request, to Shaffer Village, a development which was then primarily white-occupied. *Id.*, ¶ 23. Ms. Comer again transferred, at her request, to the Ferry–Grider project, in 1986, only to be evicted in 1988 for non-payment of rent. *Id.*, ¶ 25. According to the complaint, Ms. Culverhouse applied for housing again in 1988 and, although she requested Shaffer Village, a predominantly white-occupied project, she was eventually placed in Kenfield Homes, a predominantly minority-occupied project in allegedly deplorable condition. Item 70, ¶ 175. Ms. Culverhouse vacated Kenfield Homes on February 29, 1992, and no longer lives in BMHA public housing. Item 233, ¶¶ 4–7, Boeheim Aff. Her present status is unknown.

Again, for the reasons cited above in the discussion of the two Comer applications, Ms. Culverhouse lacks standing to pursue prospective relief. She may, however, continue in the suit on her claims for monetary damages as a result of alleged past discrimination.

### 4. *Hazel Grimes*

Hazel Grimes is 57 years old and has lived in the same BMHA owned and operated Langfield Homes apartment for 23 years. In 1966, Ms. Grimes had opted to live in Langfield Homes from among a selection sample of four primarily white-occupied housing projects. Item 70, ¶ 176. Between 1966 and the present, the racial composition of Langfield homes had shifted from 94 percent white to 92 percent minority. *Id.*

In her complaint, Ms. Grimes alleges that the condition of Langfield is deplorable and that BMHA has told her that she cannot transfer to another housing project until she attains the age of 60 years. Item 70, ¶ 176. Ms. Grimes further maintains that defendant BMHA wrongfully denied her transfer application to another public housing project because, owing to the existence of a medical disability, she qualifies for BMHA elderly public housing. Item 132 at 24. In fact, the transfer Ms. Grimes had requested was approved, and she first accepted and then rejected two available units in Sedita Apartments, a primarily white-occupied project. Item 259, ¶ 11. Ms. Grimes currently resides in LBJ Apartments, the project which she specifically requested at the time of her initial transfer application. Item 259, ¶ 12; Item 234, ¶ 5.

It is apparent that Ms. Grimes has received all of the relief to which she would be entitled if otherwise victorious in this lawsuit. As far as her claims of deplorable conditions at Langfield Homes is concerned, she no longer is a resident of that project and has made no similar allegations of LBJ apartments. Therefore, Ms. Grimes lacks standing for the prospective relief alleged in her complaint. However, Ms. Grimes, may proceed on her individual claims for monetary damages for any relevant past alleged abuses.

## B. BMHA CLASS CERTIFICATION ISSUES

Although I have decided that the individual plaintiffs do not have standing to pursue claims other than those related to individual claims for damage, I will briefly discuss class certification issues.

Plaintiffs commenced this action on behalf of a class of all named plaintiffs, and on behalf of all other persons similarly situated, pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. In particular, the four Black plaintiffs in this case allege that:

> 24. The class which plaintiffs seek to represent consists of all former, current and future minority residents of and applicants for housing projects administered by the Buffalo Municipal Housing Authority.

25. The class includes, but is not limited to:

a. approximately 6,300 minority residents in state and federally funded public housing in the City of Buffalo, who comprise approximately 71% of all residents in such housing; and

b. approximately 2,900 minority households currently on the waiting list for state and federally funded public housing projects in the City of Buffalo, who comprise approximately 71% of all households currently on such waiting list.

The fundamental characteristics of a class action are outlined in Rule 23(a), Fed. R.Civ.P. The rule earmarks four elements underlying the foundation of a class action:

1. Questions of law or fact common to a class
2. Whose joinder is impracticable
3. Whose interests will be adequately represented
4. By one whose claims will be typical of the class.

 In light of the first and third factors noted above, it is clear that the plaintiffs in this suit lack the individual standing necessary to pursue any sort of present or prospective relief. A class representative must be part of the class he or she purports to represent and must possess the same interest and suffer the same injury as the class members. *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977). For these reasons, the court will not certify plaintiffs as representatives of the class alleged in the BMHA action.

## C. DEFENDANT HIGGINS' MOTION TO DISMISS AND/OR SEVER

 Defendant Higgins, the Commissioner of the New York State Division of Housing and Community Renewal, moves for dismissal, as to him, of plaintiffs' claims against HUD and Kemp, which pertain to BMHA's federally aided projects. He also moves to sever that portion of the case from plaintiffs' claims concerning BMHA's state-aided projects. Item 82, Higgins' Notice of Motion.

Essentially, there are three categories of claims asserted against defendant Higgins. They relate to his alleged role in the segregation of state-aided projects, his role in the conversion of the Ellicott Mall and Kensington Heights projects, and his role in the segregation of federally aided projects. Defendant Higgins argues that he is not responsible for alleged segregation in federally aided projects. He contends that paragraph 22 of the complaint recognizes this concept by restricting this category of claims against Mr. Higgins only to programs "funded and administered by DHCR." Item 83 at 4.

This court's review of the complaint reveals that plaintiffs have alleged that there is a single waiting list administered by BMHA with respect to both its state and federally assisted projects. Item 70 at ¶¶ 38–39. Plaintiffs also generally allege that all defendants, including Mr. Higgins, knew or should have known of the racially discriminatory effects of BMHA's pre-Voluntary Compliance Agreement policies. Item 70 at ¶ 67. Furthermore, plaintiffs allege that all of the defendants knew or should have known of the then-current racially discriminatory effects of BMHA's policies during the 150–day interim period between execution and final BMHA approval of the Voluntary Compliance Agreement and yet failed to require BMHA to immediately terminate its vacancy-driven tenant placement system, or remedy its discriminatory effects. Item 70 at 68–73.

Importantly, plaintiffs have failed to allege any involvement of Mr. Higgins in discriminatory tenant selection policies for federally subsidized projects. Furthermore, he is not alleged as a party to or involved with the Voluntary Compliance Agreement, which was entered into earlier in 1990, between HUD and BMHA. *See* Item 70 at ¶¶ 133–6. While the amended complaint contains broad claims concerning his responsibility for BMHA segregation, it does not state any statutory authority for Mr. Higgins' liability for discrimination in federal projects. *See* Item 70 at ¶ 229.

Plaintiffs contend that their claim is not merely that defendant Higgins failed to properly administer the federally funded BMHA

projects. Instead, plaintiffs urge that, regardless of funding sources, he had failed to use his power to intervene in the operations of a local housing authority to prevent the violation of state and federal civil rights laws. Item 104 at 2. In support of their theory, plaintiffs construe various sections of the Public Housing Law to determine that defendant Higgins has various powers of intervention at his disposal which he failed to utilize. *See Id.* and Item 91 at 4–9. However, tenant selection rules for federally aided projects are established by Congress and HUD, not the State of New York, and differ markedly from the tenant selection rules for state projects. Compare Public Housing Law §§ 17, 156 and 9 N.Y.C.R.R. Part 1627 with 42 U.S.C. §§ 1437a, 1437c, 1437d, 1437n and 24 C.F.R. § 960. In short, plaintiffs have failed to cite any authority allowing the State of New York to direct the BMHA to take actions which conflict with HUD's statutes and regulations.

As a result, plaintiffs' amended complaint fails to articulate any legal basis for holding him responsible for discrimination in federally subsidized housing. Therefore, plaintiff's claims, taken as true and construed most favorably in plaintiffs' favor concerning Mr. Higgins and the federal projects, are dismissed for failure to state a claim against him. Fed.R.Civ.P. 12(b)(6).

Furthermore, plaintiffs' state claims concerning defendant Higgins' alleged role in the segregation of state-aided projects and his role in the conversion of the Ellicott Mall and Kensington Heights projects are ordered severed from this action with leave to refile without prejudice.

### CONCLUSION

Therefore it is:

**ORDERED** that Belmont plaintiffs Jessie Comer and Jewel Culverhouse have no individual standing to challenge the Belmont local preference structure or the Belmont outreach program. Accordingly, defendants are granted summary judgment, and the Belmont complaint is dismissed in its entirety.

**ORDERED** that RAC plaintiffs Jessie Comer, Hazel Grimes, Yvonne Primm, and Felicia Stokes have no individual standing to challenge RAC's Section 8 certificate program or its outreach efforts. Accordingly, summary judgment is granted defendants, and the RAC complaint is dismissed in its entirety.

**ORDERED** that BMHA plaintiffs Rosemary Comer, Jessie Comer, Jewel Culverhouse and Hazel Grimes lack standing necessary to pursue the declaratory and prospective injunctive relief sought. Insofar as compensatory damage for past discrimination is concerned, plaintiffs may individually pursue such claims.

**ORDERED** that plaintiffs' claims against defendant Higgins concerning the federal projects are dismissed, and those claims pertaining to the state projects are severed from this action.

**ORDERED** that plaintiffs file an amended complaint limited to the remaining claims in this case.

**ORDERED** that plaintiffs file a separate complaint limited to those state claims alleged against defendant Higgins.

**ORDERED** that plaintiffs' motion for class certification in the BMHA complaint is denied.